Thank you. Good morning. Please be seated. Good morning, Judge Winter. Can you hear us? I'm sorry. Can you hear me? Yes. Good morning. I understand all counsel are here, so I will turn to the first case on the calendar, Quang v. Sessions. Good morning, counsel. Good morning, Your Honors. May it please the Court, Gary Ehrman, on behalf of Petitioner. For over 20 years, I've been preparing and handling merits of silent cases in front of immigration judges, and they all begin the same way. The Court marks the evidence, and the government as always, objected to all documents that came from China that were not properly authenticated, and they had the inability to cross-examine witnesses. And what the judge will say, invariably, is, I will give it the appropriate weight I deem. This Court recently in Gao stated minimal omissions or inconsistencies in letters that come from overseas that are given minimal weight at best should not rise to the level to find a petitioner responding adversely credible. That is, it shouldn't be an inconsistency. An omission is not equal to an inconsistency. That's the holding of Gao, isn't it? That's correct. And in this case, we have a letter from a mother that failed to mention a red herring, a fact about somebody may know that he's going to church here in the United States. His claim rests upon one thing. As a practicing Christian to be sent back to China, there's a well-founded fear that he'll be persecuted by attending underground churches or by proselytizing. You put in proof that he, as non-clergy, but just an attendee of a church, of a Christian church, would be persecuted? I did, Your Honor, and I'll go to that right now on the record. If the Court is satisfied that under Gao and under recently, two days, three days ago, this Court in Maharjan 16-2565 confirmed that minor omissions in letters are given little weight or not enough for adverse credibility. So we assume my client was credible. Then the next question is, is there enough evidence in the record that a reasonable person would fear returning to China and being a practicing Christian? For this particular region of China? Yes, Your Honor, but I'll address that issue also. So there's four parts in the record I want to point out to the Court. Number one, and it's AR 181. The government exercised state control over religion and restricted the activities and personal freedom of religious adherence when these were perceived, even potentially, to threaten state or Chinese Communist Party interests. The government harassed, assaulted, detained, arrested, or sentenced to prison a number of religious adherents for activities reported to be related to their religious beliefs and practices. There were also reports of physical abuse and torture in detention. Now this is from the 2013 International Religious Freedom Report. The second portion of the record I'll point to, AR 198. And again, this comes from the same report. Authorities often confiscated Bibles in raids on house churches. The court recently sentenced a bookstore owner and a fellow Christian to imprisonment of five and two years, respectively, on charges related to distribution of Christian books. Number three, page AR 217 in the record, and this comes from the CECC, the Congressional Executive Commission Report on China, 2014. And this addresses the issue the court just raised. Authorities throughout China interrupted house church gatherings and proselytizing activities, took participants into custody, and blocked access to sites of worship. I understand this court in the past, Judge Winter, you have said in a decision in May of 2016, unpublished summary order, that there were variances in the enforcement of persecution of religious persecution of Christians. But the report says differently. It says throughout China. And are we supposed to believe that a province in China, Wangzhou, which is in the report, and a province in Fuzhou, where my client's from, which is the difference between New York and Washington DC, has different laws? China's not divided in states. It's one state, it's one government, one authority. The authority of the Chinese authorities want to suppress and oppress Christians. They believe it's a threat to their Communist Party, the same way democracy would be. And the last part of the record I want to point to, comes from the State Department report, page 224 of the record. Numerous former prisoners and detainees reported that they were beaten, subjected to electric shock, forced to sit on stools for hours on end, deprived of sleep, and otherwise subjected to physical and psychological abuse. Although ordinary prisoners were subjects of abuse, prison authorities singled out political and religious dissidents for particularly harsh treatment. So that's what's in the report, Your Honor, that shows that, yes, there's a reasonable one in ten percent chance that he'll be singled out and be harmed for the simple act of practicing his religion. I reserved some time, Your Honor. Yes, you did. Thank you. We'll hear from the appearing on behalf of the Attorney General. The court should deny the petition for review. The agency's alternative denial of relief on the merits, which is not implicated by this court's recent credibility decision in Gao, is supported by substantial evidence. Mr. Huang began practicing Christianity in the United States. This court has been clear that when alleged persecution will be based on activities undertaken in the United States, an applicant must show that authorities in their home country are aware or would likely become aware of their activities that would subject them to persecution. Here, Mr. Huang has fallen far short of making this showing. Is that because they didn't identify this man, allegedly, who was interested in his Christianity? Yes, it's because the testimony on that point is incredibly vague and also uncorroborated. The testimony is just that an unnamed villager, a neighboring villager, or a neighbor in China told Mr. Huang's parents that some other unnamed person was aware that Mr. Huang was practicing Christianity in the United States. The testimony is just too vague to allow him to meet his burden. It doesn't name anyone who was in contact with his parents, and it also gives no indication that anyone who was in contact with his parents or who allegedly is aware of his religious practice is a government official. But doesn't that become an omission under GAO rather than an inconsistency, as we discussed? Yes, it is an omission. It is an omission under GAO. However, the court, the immigration judge, and the board relied both on this omission to make an adverse credibility finding. However, the court doesn't need to affirm the agency's adverse credibility finding to deny the petition for review. The court can simply rely on the agency's alternative finding that even assuming that Mr. Huang was credible, the testimony that he offered on this point was simply not enough to meet his burden. What about the argument that Mr. Uriman just made that he put in enough evidence to show that if he was removed to China, he would be persecuted because of his practice of Christianity? The BIA seemed to not be persuaded by that either. No, as the agency noted, the country conditions evidence, while it does show mistreatment of Christians in the country, it does show mistreatment of Christians in the country. In part of the country, local authorities tacitly approved of or did not interfere with the activities of some unregistered groups. The agency relied on that fact. I think that it's actually cited, not cited, but a similar indication is made in the board's decision. Additionally, what the petitioner is essentially making is a pattern or practice claim. With evidence like that in the record, that's simply not enough to show the kind of pervasive abuse of Christians sufficient to make a pattern or practice claim. I thought Mr. Uriman just read that it was pervasive. He just read from the administrative record that there was perversive abuse of practicing Christians in all regions. I think that's the language in China. There's other evidence in the record, would you concede? The report that Mr. Uriman is reading from, at least the International Religious Freedom Report, is the same report that this evidence is in. This, as I just read, indicates that there were So there's contradicting evidence in the record, both that they are persecuted and that they're allowed to practice in some regions without persecution. Is that correct? I don't think the record contradicts itself. I think that the International Religious Freedom Report, which is a So it is, and I think the board and the immigration judge recognize that there is mistreatment. However, to make a pattern or practice claim, it has to be something that's so pervasive that every practicing Christian that returned to China would be subject to persecution. The record simply doesn't go far enough to establish that. Notably, as the board noted, there's nothing in the International Religious Freedom Report, and Petitioner has been unable to point to anything that shows that there is abuse in his province of Fujian. This court has addressed pattern or practice claims in this regard in other unpublished cases. They're cited in our briefing on page 34 in footnote 5, Leon v. Holder, a 2012 case, and Zhang v. Holder, a 2016 case. They're both unpublished, but in both decisions, the court relied on the fact that documentary evidence provided that the mistreatment of Christians varied by region and found that because the mistreatment varied by region, someone could not succeed on a pattern or practice claim, a claim that just because they established that they were a Christian in the United States, they established that they would necessarily be subject to persecution. So what Mr. Huang would have to show is that in his very province to which he would be removed, that there is a pattern or practice of abuse? Is that what you're saying? Well, pattern or practice, I think, has to do with the country as a whole. It would be probative, I think, of his claim if he could show that there were pattern or practice claims, he would be able to succeed if he showed some sort of individualized risk. And that brings us back to where we began, with the fact that the evidence he's produced on individualized risk, which he seems not to argue before this court, is simply uncorroborated and vague testimony that some person in China is aware of his to prove that authorities are aware or would likely become aware of these practices, he simply hasn't met that burden of making that showing. You indicate that there is a pattern and practice throughout China, and perhaps not in each province, but throughout China. I think that the record, again, based on the part of the country report that says in parts of the country local authorities tacitly approved of or did not interfere with the activities of some unregistered groups, I think that alone would fall short of meeting the pattern or practice standard, which is a high standard and which requires that a petitioner show that the mistreatment is a risk. What the evidence is showing is that that's not the case for Christians in China. If there are no other questions, I see my time has expired, so I would ask the court to deny the petition for review because the agency's denial of relief on the merits is supported by substantial evidence. Thank you. Thank you, counsel. Mr. Yerman, you have three minutes to rebut. Your Honor, when the government cites that language on page 190, tacitly approves, she's citing what the judge had said in his decision. But what the judge failed to cite is the next sentence of that where it said tacitly approved, but reports still existed that adherence continued to be harassed, so on and so forth. This case was decided four years ago. The evidence shows that there's systemic and widespread proof of a pattern of practice. But don't take my word for it. Last week, the Congressional Executive Committee report came out for 2018. I'm sorry, I was asking for the record in this case. I was asking a law firm to get me a record the next day. But thank you for paying attention. We all pay attention to you, Judge Wedger. In that report, the second sentence of that report now says there's widespread and systemic abuse of Christians. So because the omission in this case are very similar to those at issue in Gao, the court should remand the case for the agency to reconsider the adverse credibility finding under the clarified standards set forth in Gao and review the four years of, or the most recent country reports, international religious freedom report, so the judge has all the evidence in front of them. Could you reopen? Could you move to reopen this case and add the new report? I would only, I would have to do that if you denied the petition today. I would have to file a motion to reopen saying worsened country conditions. The new CEC says widespread and systemic. I'm hoping not to have to do that in this case. Widespread and systemic, does that mean pattern and practice? Those are the exact words necessary for pattern and practice. And this is the first time, I've been doing religion, Chinese religion cases since 2001, those words have ever come out in a report. So that's how bad it must be, because they always temper the report, or else you have governments come after you, and you can ask our former ambassador for Russia about that. So, with that, nothing further I would request. Can I ask you about the letter from the Paris? Yes. Was that prepared to support the petition, the petitioner's application for asylum? It was. You know, you always request, get what you can get and submit it. Doesn't that raise the omission of a matter critical to really an element of his claim? Doesn't that raise the importance of it? I would say no, because if it was in the letter, both the judge and the trial attorney would have given it zero or very little weight and said, so what, it's hearsay upon hearsay. That would have been a very different case before us. Yes, sir. Okay. So, let's ask ourselves, is it a supplementary or contradictory statement? I believe it's a supplementary statement, which under Gao means it's not enough to be found not credible, as opposed to contradictory. But it's a basic linchpin of his case, I think is what Judge Winter is asking. It's not really, because his claim is not that the Chinese government is aware now. His claim is if you send me back, if you deport me to China, I will continue to practice my religion and those actions will give rise to the Chinese government becoming aware of my activities. Not that they're already aware of it. Ah, okay. Thank you. Judge Winter, any other questions? No. Thank you both for a well argument, good argument. The next case on our calendar is John Doe's versus Anthem, Inc. and Express Scripts, Inc. Thank you. Thanks. Good morning, Your Honor. Good morning. Jeffrey Lewis representing plaintiffs, and we've divided our time, the initial 13 minutes, 9 minutes for me to argue the ERISA claims and 4 minutes for Mr. Watley to argue the ACA and RICO claims. Okay. In today's healthcare system, the provision of prescription drugs at reasonable prices is one of the crucial functions in managing and administering ERISA health plans. The ERISA plans, on whose behalf plaintiffs bring suit, entered into contracts with Anthem that delegated to Anthem the discretion to provide prescription drugs to the plan participants and to set the pricing for those drugs, including by contract with a pharmacy benefit manager or PBM. As a result, Anthem was a fiduciary to the plans and their participants because it had an exercise discretion on behalf of the plans. But tell me, how would they get to be a fiduciary? I missed that little step in your analysis. Well, because the definition of fiduciary under ERISA is a person, among other things, who has authority or who exercises discretion with regard to the management or administration of the plan. And the management or administration of prescription drugs is one of the key functions that a fiduciary of an ERISA plan carries out. But Anthem got out of that business. They sold that business, right? I mean, they hired someone to manage that business. No, they did not exactly. They sold their business, their subsidiary, but they hired someone to provide prescription benefit management. Why wasn't that a business decision as opposed to acting as a fiduciary? The decision to sell their business was a business decision. The decision on behalf of the plans to contract to provide pharmacy benefit management services to the plans was a fiduciary decision under the clear precedence of this court and others. And the coupling of the two is what created the breach of fiduciary duty. But the fact that something is related to a business decision, as the simultaneous and conditional negotiation or contingent negotiation of the two contracts was here, does not render the acts taken with regard to the plan non-fiduciary acts. And the best example of that is the Donovan v. Beerworth case. In Donovan, there was a hostile takeover bid for Grumman Corporation. The corporate officers and directors, who also were fiduciaries of the plan, decided to resist that plan. One of the mechanisms they used to resist that takeover bid was that they had the plan buy additional shares of the stock so they could vote it against the tender offer and also not tender the shares that this plan already owned. The Second Circuit said that the act of the plan, the act related to the plan, was nonetheless a fiduciary act. The fact that it was coupled with a business decision was relevant not to the fiduciary status, but it was relevant to the breach because it showed that they were motivated to not take into account the interests of the plan and its participants when they acted with regard to the plan. So the point is Anthem exercise had the discretion and exercised the discretion. And this Court, the fact that it was in a contract, it doesn't matter. The F.H. Clear case, this Court said quite clearly, I'm going to read it because I think it's directly on point here. This Court said that if a contract confers discretionary authority on a service provider, which Anthem was, that gives rise to fiduciary status and duty even though the contract itself is the product of an arm's-length negotiation, arm's-length bargain. And it also said, after a person has entered into an agreement with an ERISA plan, and Anthem did enter agreements with the ERISA plans, the agreement may give it such control over factors that determine the actual amount of its compensation that the person thereby becomes an ERISA fiduciary with respect to that compensation. So Anthem had the discretion here on behalf of the plans, and that's the hallmark of fiduciary status under this one test. The discretion is alleged in the second amended complaint. Yes. It's there. Is it anywhere else in the record? Well, this is not a motion to dismiss, Your Honor. So we only have the allegations of the second amended complaint. I don't think the contracts between Anthem and the plans are in dispute. We allege that those contracts conferred on Anthem that discretion, and that's the state of the record before this court. And in addition, Anthem then delegated further discretion to Express Scripts over the pricing and furnishing of drugs to the plan. And the district court held that, well, that discretion was constrained by certain provisions of the agreement between Express Scripts and Anthem, but not that it didn't exist. And this court, again, and the district court had been clear that the exercise of discretion, albeit constrained, is nonetheless still the evidence of fiduciary status, proof of fiduciary status. So, for example, here, Express Scripts exercised discretion with regard to several things. Number one, if Anthem is correct in its contentions and its dispute with Express Scripts, Section 5.6 of the agreement set a very loose constraint on Express Scripts that they should charge competitive benchmark pricing. Whatever that was. Pardon me? Whatever that was. Whatever that was, exactly. We don't think that was a good enough provision anyway. We are arguing that both Anthem and Express Scripts had a fiduciary duty to the customers. Yes. To the plan members. That's right. Because Anthem was delegated by the plans the complete discretion to negotiate PBM contracts to provide prescription drugs to the plans and their participants, and Anthem, in turn, delegated at least part of that discretion to Express Scripts because the contract with Express Scripts, both through Section 5.6 and also through Section 5.4 and the Exhibit A to that, gave Express Scripts discretion because, although it set limits, it also gave Express Scripts the discretion to change the limits. Right. As I read the contract, tell me if I'm wrong, if Anthem felt that they weren't meeting this benchmark price, they could begin negotiations, but Express Scripts had no duty to agree with the price. They had no duty to change their pricing based on the negotiation. Is that correct? Well, that's one interpretation of the contract. Anthem and Express Scripts dispute that, and it has not been determined by any court yet, and I think that's going to be a subject that Anthem and Express Scripts are litigating and will litigate. But there's another provision of the contract that the judge found set the constraints, and that is Section 5.4. In Section 5.4, A only sets constraints. That is, it sets maximum prices that Express Scripts could charge, but within that gives Express Scripts discretion to charge whatever it wants. And number two is that some of the constraints that were in Section 5.4 were the— It is a restraint, but Express Scripts still exercise discretion within that limit. And I think Your Honor has an opinion, but I can't remember which case it is, and the Second Circuit has made clear that a constraint on discretion that doesn't absolutely set it, a constraint which gives an entity room within the constraint to exercise discretion, the entity will still have discretion, albeit limited. Assuming, just for the sake of the argument, that there is a fiduciary duty, I take it that the violation in your view is the 2009 contract. In Anthem's view? Yes. In Anthem's discretion? Well, there are several violations. One is the entry into the 2009 contract, effective at the beginning of 2010. But second, as the Supreme Court recently made clear in the Tibble case, a fiduciary has an ongoing duty to monitor whether or not a service provider is functioning according to the standard to which it's held, and it has an ongoing duty to correct past breaches of fiduciary duty. So our theory is from day one or day two that Anthem had an obligation as a fiduciary to remedy its past breaches of fiduciary duty, to remedy Express Scripts' breaches of fiduciary duty, and to try to renegotiate the contract or go to court. And Anthem did try to renegotiate. Right. There is a lawsuit. Isn't there a pending Anthem suing Express Scripts? That's correct. But here's what the difference between our suit. What's the status of that lawsuit? It's pending. There's discovery pending. It's discovery, in discovery in the district court, I believe. But that lawsuit is different, Your Honor. First of all, they didn't file it until 2015 or 16. Our claim, and second, it only, and so our claims go back to 2010. And Judge Ramos held that we could assert claims at least from May 6, 2010 on. So, and our monitoring claims and our failure to renegotiate claims would certainly be broader than Anthem's. But the second important point is that Anthem's lawsuit against Express Scripts only seeks damages for the difference between what they claim competitive benchmark pricing was and what Express Scripts charged. Our theory is, and we've alleged it quite clearly, is that Anthem's, that that contract was not in itself what a loyal and not conflicted fiduciary and what a prudent fiduciary should have negotiated. The terms should have been some fixed terms, as is much more common in the industry where you get a certain discount off published prices. And so the difference in damages between our case and the theory of our case is a good deal. It covers more years and a greater amount. And third, it's not even clear from Anthem's lawsuit that they're seeking recovery on behalf of the plans and participants, as opposed to just seeking to pocket the money. Well, I will ask about it. All right, let us hear from the other appellants. Counsel? And you've reserved time for rebuttal, Mr. Lewis. May it please the Court, I'm Joe Watley, and on behalf of the appellants, and I'm here to address the RICO claim and to make, I hope, one clarifying point with respect to our ACA claim. First of all, and those are two claims that are only against Express Scripts in this case. First of all, Judge, the Court below dismissed the RICO claim. It accepted some — it denied the motion with respect to some elements, but it dismissed the RICO claim on one specific ground. And at page 42 of the Court's opinion, it discusses that, that to defeat a motion to dismiss, the plaintiffs must have adequately alleged that ESI fraudulently represented to Anthem, that it would charge Anthem participants competitive benchmark pricing for prescription medication. And the Court went on to say that we had not satisfied Rule 9b in making that allegation. And so let me quickly say, tell you where we did it. We allege that the representation was made in Section 5.6 of the 2009 and 2012 complaints, where it is said, and these are the words, that it would ensure that WellPoint is receiving competitive benchmark pricing. Now, we allege it in paragraph 13 of the complaint. We reallege it with respect to the 2009 contract. We reallege it in paragraph 137. In footnote 3, we allege the 2012 contract. We reallege those in paragraph 251. And in paragraph 252, we allege that at the time the contract was entered into, there was a present intent by ESI not to comply, which is the requirement for, to make a statement in a contract fraud under the countrywide decision that this Court has entered. Now, how is it, of course, you don't have to allege intent with specificity under Rule 9b, but how is it plausible that we show intent here? And the way it's plausible that we show intent is that we allege in paragraph 15 and ESI acknowledges, in fact, it takes the position in defending the Anthem claims, that it paid $4.675 billion instead of paying about $500 million for Anthem's PBM subsidiary. So it could charge higher prices. And the logical inference, since this is a motion to dismiss in this Court's review in de novo, the logical inference is that it had an intent. It paid over $4 billion. It paid for the privilege? It paid for the privilege for charging more than it would have charged others, which would have been a competitive benchmark. As Anthem's expert health strategy has gone out and determined, and it in fact has charged more than $18 billion more than competitive benchmark pricing is determined by an independent expert. Those are the facts. Those are the allegations. And with that, the specificity, the plausibility of present intent survives. Now, turning really quickly to the ACA, the only point I wanted to make here is to clarify what is the neutral practice we are alleging has a disparate impact. And the neutral practice that we are alleging is the charging of excessive or above competitive pricing, where there is a 20 percent coinsurance amount for individuals. And for people with disabilities, if we allege those disabilities in paragraph 453, have to get specialty pharmacy drugs that have very high prices. So obviously, taking a sample percentage, if something is 10 percent greater, for $1,000, that has a much greater impact if it's 10 percent greater than $10. But that is the neutral practice or policy we are alleging here. Thank you. Thank you very much, Your Honors. We'll hear from Anthem first. Sorry. Good morning, Your Honor. Glenn Kurtz on behalf of Anthem. The governing law here is settled, and it was correctly applied by the district court. The seminal case is PEGRA. It's a decision issued by the United States Supreme Court in 2000, and it addressed the fact that a person that functions as an ERISA fiduciary in fiduciary functions like administering claims also functions during the course of the business day in non-fiduciary ways. And recognize Did you sign this contract with Express Scripts that was just a pure business decision? It was completely a business decision. Anthem had just spun off three of its subsidiaries. As part of the deal. Well, as the It was part of the same deal. They sold NetRx to Express Scripts, and they entered into a deal with Express Scripts. Correct. And they had a choice of paying, as counsel just reiterated, a smallest amount or a largest, or receiving that paying. And they took the larger amount and gave Express Scripts the right to charge more. Is that correct? Did I get the essentials? I think you have a generalized understanding, but there's some important nuances that I'd like to address. Okay, always. I'm interested in nuances. Thank you, Your Honor. I mean, the first issue is it was a sale of subsidiaries. And when you sell subsidiaries, you're not subject to ERISA law. You're subject to corporate law. Your duties run in favor of stockholders, and your duties are to maximize the value of the stock on behalf of the company and its stockholders. And that is why PEGROM ensures that you don't have irreconcilable conflicts. Because you're a fiduciary and administering claims doesn't make you a fiduciary when you make a business decision to change a corporate organization so as to sell subsidiaries. I know, but here it appears to an outsider that they sold their own customers down the river, taking the money for them, for themselves, and allowing their customers to be charged more money for the drugs. That just doesn't seem fair. Let me address that very specifically. Once Anthem sold its PBM, it needed a new PBM service provider. Anthem entered into, not on behalf of a plan, not for a plan, for itself. Because Anthem can't function without PBM services. Anthem entered into a PBM contract, long-term PBM contract, pursuant to which Anthem buys its drugs on the same pricing that the plaintiffs are buying the drugs. In terms of the deal structure, these are very early proposals. This is not the ultimate negotiation. Anthem ran a process with Bank of America. There was a number of bidders. There was a number of bids that came in. And Anthem negotiated with a number of bidders until it came up with a price that was acceptable to it. Do I understand that your view is that any fiduciary duty in setting the price for the prescription drugs, from your point of view, Anthem pushed that duty to ESI? Anthem has no discretion with respect to the price, and the pricing is set by ESI. But I ought to note that they negotiated the deal. They could have controlled the pricing. Anthem negotiated the PBM agreement, and this is what's important, and it will tie to Judge Pooler's question as well. There was never a proposal on the table that you can either take $4 billion, which you're required to do if you're stockholders, or you can take $500 million and get different pricing for plaintiffs. The pricing that was being offered, the proposal that had a lower purchase price, was for pricing to Anthem, which Anthem could then use to make more money in its sales. Now, this is the way corporate America works. Nobody legitimately tells you, I'll give you $4 billion, I'll give you $500 million. Which one do you want? Okay, so the customers, the drug takers, ultimately lose no matter who wins. Heads or tails, you lose? Well, I think your Honor made the right point that it's a highly competitive market, and the pricing is whatever the market bears. But if you're a member of a plan, you can't take advantage of any competition. You have to go to someone who's part of the plan to fill your prescription. You actually, as a plaintiff, you're afforded a lot of offered plans from a lot of different health insurers. You look at all the terms and provisions, which are not just drug pricing. It includes hospitalization, networks. Once you sign up with Anthem, right, once you sign up with Anthem, you can't take advantage of any competition for drug prices. You have to use someone in the Express Scripts network. Is that not correct? No. You can use anyone you want, but people tend to want to be able to use the networks that are provided by their health care provider. There's no exclusivity in there. To the contrary, the plans say you can buy from anyone else you want to choose. The key here. This is Judge Winter in New Haven. Would you illuminate one point for me? When Anthem took the higher amount from ESI, did it bear any risk, financial risk, from ESI raising drug prices? Anthem bore the risk of rising drug prices in three-year increments, subject to certain things called exception pricing, where you can negotiate. What does that mean? It means that every three years, ESI was required to engage in a market check, pursuant to which they were supposed to negotiate for the stated objective of, quote, ensuring that Anthem is receiving competitive benchmark pricing. But they didn't have to. When you say Anthem, can I continue my line of questioning, Judge? I'm sorry. Does Anthem bear any of the cost of a price increase on ESI's part? Anthem bears the cost of a price increase with respect to all of its own purchases, which is a significant portion of its business. Anthem is buying on the same terms that the plaintiffs are buying on. I do want to note, though, that the plaintiffs aren't- If ESI raises the price of a drug, and it is purchased by members of the plan, does ESI keep the revenue, or does Anthem have to pay part of the price of the drugs, part of the price increase? The revenue is kept by ESI. The way this works is there's no alleged breach of any health plan. The health plans specify the maximum price. It says you will buy drugs at prices, and counsel was not right in saying it wasn't expressed as AWP minus a discount. It's precisely reflected that way. The plaintiffs purchase. They buy a health plan. They're offered pricing terms. The pricing terms say you will purchase drug categories up to a particular price. There's no alleged breach with respect to the price that they're paying. This is an offering in the marketplace. It is true. Anthem could have offered this pricing and kept a bigger margin had it taken a different M&A structure in 2009, or Anthem could have passed on some of those savings in the hopes of growing its footprint in the marketplace. But there was- It didn't pass on any of the savings, did it? The profit they made from selling their subsidiaries. No. Anthem sold its subsidiaries, and the price for that was with the stockholders. That's not a fiduciary function. That's not the administration's risk plan. Unless they were acting as a fiduciary when they entered into this contract. The health plans themselves have no provision whatsoever assigning discretionary authority or addressing in any fashion the sale of companies or the entrance into a PBM agreement. That's done in a corporate way. These are offerings. Anthem offers into the marketplace pricing. They say, here is our whole basket of services. We give you hospitalization. We give you deductibles. We give you premiums. We give you drug pricing. We give you networks. We give you access to certain types of doctors. The plans, the plaintiffs, they look at all the offerings in the marketplace, and they select the one that, as a whole, is most favorable. Our offerings into the marketplace include the pricing, and it is a black letter law principle from the Supreme Court and this circuit that plan design and plan content. What you offer into the marketplace is not a fiduciary function. You sit in an arm's-length transaction with respect to that. Do you think consumers know that it's an arm's-length negotiation? Of course they do. Is there a way to go? Of course they do. They're represented by PBM consultants and health plan consultants, and they negotiate with Anthem or they negotiate with Aetna or they negotiate with Cigna or UnitedHealth Group. The people at the end of the chain, that is the consumers of the drugs, they really have no choice, do they? Well, to the extent they're employees and they're employees of an employer, they rely on their employer to negotiate their benefits. It's important to note that the court correctly found ERISA guarantees no particular level of benefits and no particular pricing, competitive or otherwise. This is a transaction where Anthem negotiated with employers who also were negotiating with competitors for a whole host of services and pricing, and they accepted the pricing, and there's no allegation of breach of the health plan. Isn't it fair to say that the complaint alleges that the $4 million purchase was financed by an understanding that there would be an increase in prices that would benefit both companies? In fact, no. In fact, there's no allegation that the pricing increased because the pricing didn't increase. When Anthem spun up NextRx, the pricing went down. They got better pricing, and one of the plaintiffs came on later and took the terms that were offered. There's no breach of the health plan, no breach whatsoever of the health plan. They were provided the pricing. They were promised to be provided. They bought prices. They bought networks. They bought formularies, and no one's alleging there's a breach of that. They're saying you could have entered into a different M&A structure. You could have taken money out of stockholders' pockets and gotten better pricing, and then you could have offered that pricing to us. But Anthem was never – the side didn't say, I'll tell you what, I'll give you $4 billion or $500 million. They said, I'll give you with attendant pricing. The idea was, do you want to make your money today up front for the stock sale? And there's fairness opinions all over the place. This was a fair transaction, or would you like to take less up front? I'll ask another question, and that is, suppose there had been no Anthem ESI deal, and Anthem continued to perform the functions ESI undertook to perform, and Anthem continued to perform them in-house. Would the in-house pricing be essentially the same as the ESI pricing? That is to say, would Anthem have the discretion under the contract to raise the price the way ESI did? Anthem had the – well, Anthem didn't have discretion under the contract. Anthem sold policies with guaranteed pricing maximums. You could buy drugs up to a particular amount, and they would have had the same ability as ESI. Did the discretion to raise prices to the maximum remain whether or not it was within ESI or Anthem? Yes. The ability to sell the drugs at a price consistent with the terms of the contract would have had to have been performed either by Anthem or by an outside PBM. Are we supposed to conclude, then, that the ESI contract did not alter the planned contract? Correct. It did not alter the planned contract. All planned contracts are negotiated. And your view is that the fiduciary obligation that the plaintiffs would find on your part would have existed even without the ESI contract? I think the allegation, the incorrect allegation that there's some discretionary function would have existed irrespective of who's performing the PBM services, whether that was an outside firm or inside. Their argument is, why aren't we getting the best pricing conceivable? And they're not entitled to the best pricing conceivable. But the allegation is that they had the discretion. That's the allegation in the complaint. But Anthem, the allegation is actually that Anthem exercised discretion, not in pricing. That's done by ESI, but that Anthem exercised discretion by contracting, by spinning off its PBM subsidiaries and then contracting. That's the allegation with respect to Anthem. Anthem, the way it works in terms of drug fulfillment is that the plaintiffs decide what drugs they need. They go to a pharmacy. The plan then forwards to Anthem the amount that was agreed to in the plan and then Anthem transfers that to ESI. And that would happen regardless of what the terms are. The issue is, their core allegation here is that the terms, that Anthem could have negotiated lower terms and if it had done so, it could have offered those terms in the marketplace. Anthem has no fiduciary obligation to offer any terms in the marketplace. And when ESI was making a variety of proposals on consideration, the idea wasn't, will your stockholders want $4 billion or $500 million? The idea was, do you want to make your money up front or do you want to make it through the ability to make it on each sale? They clearly made the decision to get the money up front. Clearly, they ran an M&A process. And the way in which that was done, if I understand the complaint, was by increased prices. Not by increased prices. The prices were lower following the spinoff, not higher. I'm talking not about the facts. I'm talking about the allegations, the plausibility. There's no allegation that the price increased by reason of the spin. Immediately after the spin. Correct. But over the long period that the contract has been in existence, the allegation is that the ultimate consumer paid much more for each prescription because they had paid this much up front. Am I right about that? Yeah. Because ESI has not reduced the pricing to competitive benchmark pricing, your Honor asked about that, they have an absolute obligation. A good faith negotiation is an enforceable. So the argument made by the plaintiffs is that in making this deal, Anthem ceded authority on prices to express scripts to the detriment of its insureds. That's the allegation, whether you agree or not. Well, that's true, but Anthem would cede the discretion on pharmacy pricing to the pharmacy benefit service provider in all circumstances. The issue is what's the number. The number they're being charged is the number they agreed to in their health plans. The core allegation here is not that there's a breach of the health plan. There's no alleged breach of the health plan. The core allegation is when you made me an offer and I accepted it in the marketplace, I liked it better than Sigma, I liked it better than others, I now know that you could have been in a position to offer me better pricing had you wanted to do so. And this all is born from the fact that there was an M&A structure proposed very early on, not the deal that got signed. There was a lot of M&A activity there, but that you could have taken your consideration by either taking it up front and making the amounts you make now off drug pricing, or you could have taken it with better drug pricing for Anthem. There was never a proposal to extend reduced drug pricing to the plaintiffs or any other plan. It was to Anthem. And then Anthem, in turn, could have kept the margin. Wait a second. Wasn't part of the deal if they paid only $500 million that the prices would be lower? The prices would be lower to Anthem, not to the plaintiffs. That would have been lower pricing to Anthem. Anthem then would have made the margin. Wait. But wouldn't the ultimate consumer pay a lower price for each prescription? Only if Anthem chose to go out with an offer on its health plan for lower pricing. Yes, I am. So wasn't that the deal? They would take the money, lower amounts, and then take it over time instead of taking it in a lump sum at the beginning? Correct. That would assume that Anthem chose to offer the same pricing that ESI is providing. So Anthem never really cared about the customers. They just wanted as much money as they could get. I don't think that's fair at all. I think the proposal was not to give customers lower pricing. It was to give Anthem lower pricing, and then Anthem would have made the margin by charging the customers more than Anthem was paying for. My mistake is in thinking that anyone cared about the ultimate user. Your Honor. Obviously no one does here. But Anthem has a fiduciary obligation to stockholders. We'd be here in a stockholder lawsuit if the allegation was Anthem turned down $4 billion instead of $1 billion. And the whole system stinks. Well, the system is controlled by the market, and the market is very competitive. That's why people are talking about Medicare for Everyone, to get rid of this convoluted system where the ultimate user pays more to everyone along the chain. Your Honor, I ought to note that the pricing formulas over time have changed, and that is why the pricing today is different than what the pricing used to be. And the beneficiary of that is ESI, not Anthem. Anthem has brought a massive lawsuit specifically to try to recover these amounts. Anthem, the pricing was competitive at the time of the deal. Let me ask, as I hear your argument, there is no fiduciary duty to the consumer arising out of these contracts to obtain the lowest price. That is correct. The plans don't grant fiduciary discretionary authority, and they don't address it. This is a corporate contract that applies to Anthem corporate-wide. You're saying that the contract between the plans and Anthem, in order to create a fiduciary duty, it would have to spell it out? It would have to provide a discretionary function that Anthem would have to be wearing a fiduciary hat like administration of a claim. Administration of a claim or setting a price. No, the setting of the price is plan content or plan design, and it's a matter of well-established black-letter law. When you offer pricing to clients, as here, that's not a fiduciary function. You sit in an arm's-length relationship, selling into the marketplace. The plaintiffs choose to contract under this plan, or they don't choose to contract under this plan. There's no duty under ERISA to offer competitive pricing, but the pricing was competitive when the contract was entered into between ESI and Anthem. This gets back to Judge Winder's question. It does affect the amount of money that Anthem gets, the price that is ultimately set. At this point, no, it affects the amount ESI gets. Anthem passes this pricing through to ESI. So the plaintiffs are paying the amount as determined by ESI, and Anthem is suing ESI for the amount that is inflated over what is competitive benchmark pricing. Anthem doesn't get these economics. ESI gets these economics. That's why we're suing. Well, Anthem got the price for the stock, where there's fairness opinions confirming it was the right number for the stock, and that was a stockholder issue. Again, what's key here is Anthem makes offerings into the marketplace that has pricing terms and other terms, and plaintiffs accept that or they don't accept that. And when you have a contract that says I can charge you up to $10 and you get charged up to $10, there's no claim. It's not a fiduciary function. Anthem's not deciding the $10 number. Anthem's putting that off from ESI, and plaintiffs have the ability to say I don't want to pay that for drugs. I'm not going to enter into a contract with you. But the offering is the offering. Once Anthem enters into a PBM agreement on the terms it enters into, it goes to the marketplace and says I can offer you the following terms in a health plan. Do you want that? And the health plan, the employers take them or leave them after evaluating them as against the other offerings in the marketplace, and the marketplace is competitive, and they accept the terms and they don't claim there's a breach. The idea that you had to go back in 2009 in a sale of subsidiaries and you had to take consideration and put it into lower pricing, which was designed to allow Anthem to make more money per drug sale, not for the good. There was never an offer for the plaintiffs to have lower pricing. It was Anthem's pricing. The plaintiffs aren't even third-party beneficiaries of the PBM agreement. They're specifically not. It's an agreement between Anthem and ESI. And whatever pricing Anthem got, it could have passed on pursuant to the terms of its health plan, or it could have passed on substantially inflated pricing if the market would bear that. There's no fiduciary function when you're contracting in the world with employers. You only get a fiduciary function under PEGRAM and otherwise, and including Flanagan versus General Electric, a panel Judge Winter sat on, when you're performing an administrative act in connection with the claims or an investment in the plan assets. These are not plan assets. The plans had no interest in the subsidiary and they had no interest in the PBM contract. All right, that's a good place to stop. Thank you. Thank you very much, Marsha. We've asked a lot of questions. We'll hear from Express Scripts. Good morning, Your Honors. Good morning. Thank you, Judge Pooler. May it please the Court, Derek Schaefer here on behalf of Appellee Express Scripts. Your Honor, the Express Scripts portion of this case, respectfully, it reflects an effort by plaintiffs to federalize a state law contract dispute between Express Scripts and Anthem. Specifically, they're piggybacking as third parties on Anthem's allegations of a contractual breach by Express Scripts and somehow trying to spin that into federal claims under ERISA, under RICO, and under the Affordable Care Act. That bid is foreclosed by settled law and this Court should affirm the dismissal in full. With my time, Your Honors, I'll be focusing on the ERISA issues, but I'm glad to answer, of course, any questions. I have one question based on our discussion with Mr. Kurtz. Are you prepared to tell me that Express Scripts was absolutely neutral in the initial aid? Would they pay $500 million or $450 billion? Were they neutral about that? I don't know about neutral, Your Honor, because obviously Express Scripts is at $4 billion more if it upfronts that money. But they were willing to do both those things according to the allegations of the complaint. And I would emphasize, Judge Pooler, that that was Anthem's decision as to how they wanted to proceed at that point. Well, obviously, they had to make up this extra $400 billion that they paid to Anthem for the subsidiaries and for the contract. They had to make it up somewhere. Well, Your Honor, let me just emphasize, this was an arm's-length business negotiation between Express Scripts as a business and Anthem as a business, and I think the case law is uniform. It says they don't wear fiduciary hats at the bargaining table. If they did, there's nothing to negotiate. They'll just give basically this would be a charitable endeavor, which it's not. Express Scripts has its shareholders, too. And Express Scripts took a tremendous risk, Judge Pooler, by paying the $4.67 billion up front. If the market had moved up, Express Scripts isn't able to go after Anthem for the difference at that point. It's simply out the money, and it has below-market pricing that's baked into Section 5.4 and Exhibit A. It's fixed over the course of 10 years. So that was a business decision. The pricing of the drugs is fixed? The pricing of the drugs, Your Honor, is strictly capped. It's AWP and a discount on that. You can see it in Exhibit A of the contract, which is part of the exhibit. And Section 5.4 operates in tandem with that to identify different metrics. It's the lowest of any of them. That is the ultimate price. But I think the implication was that there was no limit on the pricing that Express Scripts could charge. And, Your Honor, I think that there's confusion in the plaintiff's complaint that way, but Judge Ramos was perfectly clear about this. I would direct Your Honors to, I believe it's Special Appendix, pages 29 and 31, goes through how Exhibit 5.4 operates in tandem with Exhibit A. When you read Exhibit A, it is an exquisitely detailed menu of exactly how the pricing was to work over the span of 10 years of the contract. What's the basis of the suit of Anthem v. Express Scripts? Section 5.6, Judge Pooler, about competitive benchmark pricing and what would happen if Anthem, every three years, it has the right to conduct a market check. There are three sentences of Section 5.6. The first sentence says that Anthem and a third party provider of its choosing can conduct a price check to ensure competitive benchmark pricing, speaking to what Anthem and its third party does. The second sentence says if Anthem determines that the pricing is not competitive at that point in time, it can return to Express Scripts and Express Scripts will negotiate in good faith. Just as it negotiated in good faith at the initial contracting stage, it returns to that as a business. But they never changed their prices in any of the three-year investigations. There's no allegation to that effect, Judge Pooler, and if they had alleged that, we probably would have ruled 11 of them because there were negotiations at the three-year mark that resulted in exception pricing. That's part of what went into an amended 2012 agreement that Express Scripts and Anthem agreed to. The allegations of the breach come from a 2015 price check, so this is six years into the contract. When there was a disagreement between Anthem and Express Scripts that persists to this day, it is being litigated in the district court before Judge Ramos. It's in discovery. We don't think that this court needs to speak to Section 5.6 in its opinion because I would emphasize, Judge Pooler, the case law is uniform that when Express Scripts negotiates with Anthem at arm's length, they are negotiating as businesses. They do not wear a fiduciary hat for that, and as the Ninth Circuit pointed out in the Santameno case, it would yield absurd results. In fact, it would be an impossibility to say that Express Scripts negotiates as a fiduciary. There would be nothing to negotiate, Your Honor. All it would do was say we'll lower the prices however may be desired, and, of course, there's no corresponding way for Express Scripts to make its fair money on the market. There's no opposite duty on the other side of the table. One other thing to emphasize, Judge Pooler, the plaintiffs disavowed before Judge Ramos any reliance upon Section 5.6 for their theory of fiduciary duty as to Express Scripts. Judge Ramos noted that to them. He invited, he did not dismiss with prejudice. He explicitly invited them to return. He gave them leave to amend. They opted not to do that and to come up to this Court. But I think in this profile especially, Your Honor, Section 5.6, the only provision that they really rely upon as to Express Scripts is no basis for reversing the dismissal. And I've emphasized one other thing, Judge Pooler, about the ERISA side of this. It's telling that the contract that plaintiffs are purporting to make their case out of is the contract between ESI and Anthem. There's no plan contract that's pleaded into this complaint. Doesn't it derive from this contract? No, it does not, Your Honor. In fact, when Express Scripts negotiated with Anthem, there was no plan contract as far as Express Scripts knew. And I would direct Your Honor to Section 2.10 of the contract between Anthem and Express Scripts, where Anthem explicitly reserves the right to set pricing for plans and for customers as Anthem pleases. That's up to Anthem, not ESI. And lest the Court think that that's just a theoretical reservation, I'd point you to 2.10b. 2.10b explains operationally how it is that pricing is going to vary plan by plan based on the agreements that Anthem strikes with each individual plan. So the pricing that Express Scripts has as to Anthem not only isn't the pricing that plans face, but there's a specific accounting for what actually is the pricing plan by plan. And that's not what plaintiffs offer as basis for their complaint. Counsel, we started this discussion with you telling me that Express was severely constrained by the terms of the contract as to what they could charge. Yes. Is that correct? Correct. And so what is the basis then for this lawsuit, and what is the basis for the claim that customers are overcharged? I think, Your Honor, it's that they feel that they don't like the pricing that they're getting in the health care marketplace. The plaintiffs can best answer that question. But if that's their gripe, Judge Pooler, it could be a gripe that they would state against drug manufacturers, against all sorts of health care providers, against everyone who's part of a health care chain and is contributing to the prices that they face. The terms of the statute say that the fiduciary duty attaches if and only if a defendant wields discretionary authority or discretionary responsibility in the administration of covered plans. That's not what Express Scripts is doing, Your Honor, because it doesn't know what plans have agreements with Anthem and what pricing Anthem is agreeing to with the plans. Of course, Judge Pooler, if customers feel that they're not getting the right pricing, if they're not getting a fair shake, they have planned fiduciaries. They have planned fiduciaries who are responsible for striking fair terms with Anthem and making sure that everything is consistent with the best interests of... Other people have responded. Plan administrators of those particular plans can go to Anthem and say, we're paying too much for drugs, and Anthem could go to you and say, we're paying too much for drugs. If a buck has to stop somewhere, where does it stop? It stops, I think, firstly, it certainly goes to the plan administrators. They can be sued as fiduciaries if they breach their duties by entry agreements that are not consistent with the best interests of the beneficiaries and the plans they represent. But there's no allegation that Express Scripts here ever contracted with a plan. There's no allegation consistent with the terms of the contract that Express Scripts was setting the pricing for plans. It just wasn't, Your Honor. It may have been part of this chain of variables that go into what the ultimate price is, but this court recently in the Allen case, where there were banks alleged to have manipulated FX rates, noted it's not like those banks, by virtue of that, even though that was egregious misconduct that was alleged, have control over the plan assets or dictating prices. There are too many different factors that go into that to give rise to an ERISA case. But I'd also emphasize, Jed Pooler, if they wanted to make this case based on what the plan agreements and the plan pricing are, they would surely have said something about what those plan agreements actually say. And when it comes to the function of a pharmacy benefit manager, this is in response to Judge Winter's question, the courts have uniformly held, I point you, Your Honor, to the Seventh Circuit in Karamark, the Sixth Circuit in the DeLuca case. We have the INRI Express Scripts, INRI United Health Group, and the list goes on. The Aramiki, the Chamber of Commerce, and PCMA, and APHIS, I cite every case that has looked at this question and said it's not the pharmacy benefit manager who's wielding discretion over plan assets and plan management such that they function as fiduciaries. And if the rule were different, Judge Pooler, if this Court were to hold that a pharmacy benefit manager in Express Scripts' position owes fiduciary duty to plans, it owes fiduciary duties to individual plans, and the Sixth Circuit explained in DeLuca, and our friends for the plaintiffs have no answer to this, that that would be completely counterproductive. It is a self-defeating theory because the way that Express Scripts does its work, the reason that people turn to it as a pharmacy benefit manager is it negotiates across its business with the drug manufacturers to drive the best deal it can and to get prices down. If you say that Express Scripts has to interact as a fiduciary and look at individual plans and what are the demographics and what are the drug needs, it doesn't have that large market leverage. It can't drive the best deals and get the best prices from manufacturers. And as to the 2009... Who can do that? Who can do that? Best deals for the ultimate consumer. But that's what pharmacy benefit managers do. That's why Anthem turns to Express Scripts, and that's why plans, when they have a choice, decide that they're going to use Express Scripts as their pharmacy benefit manager. You try to get the best deal for the people who are going to take the drugs, right? Yes, Your Honor. And that gets passed on to Anthem? Yes, there's pricing that's worked out between Express Scripts and Anthem. You go back to the original contract where you paid them a lot of money so you could charge more money to the ultimate consumer. Your Honor, it was not to charge more money to the ultimate consumer. Anthem is the consumer in that exchange. And Express... I want to be clear. Express Scripts takes a tremendous risk by paying $4 billion. If it turns out that the market moves up... There's no allegation that that pricing was not competitive as it was scheduled into Exhibit A over the course of 10 years, down to meticulous detail. That allegation is not in the complaint. That is competitive pricing. There are predictions that are made about where the market might move over the span of 10 years, to be sure. But if it turns out that the market moves up, Express Scripts is out $4 billion to Anthem, and it has no ability to charge prices above those set by Exhibit A. It's losing money, and it doesn't have a reverse ERISA claim or anything like that. It made a business decision that it was willing to incur that risk, and it was willing to proceed according to Exhibit A. If plans didn't like that, they didn't have to contract with Anthem, or if they did contract with Anthem, they could choose a different pharmacy benefit manager. There's no dispute that that was explicitly allowed to them under the terms of these agreements. And there's no allegation, I want to emphasize this, there's no allegation that ESI breached Section 5.4 or Exhibit A, or charged prices that it was not permitted to charge. I'm going to hear a rebuttal from the plaintiffs. I'm sure they either agree or don't agree. I think that their disagreement will be about Section 5.6. They will say that they are agnostic. They're not alleging that Express Scripts did breach Section 5.6. They're simply saying that to the extent that Anthem may be right that Express Scripts breached Section 5.6, Express Scripts should be liable not just to Anthem, but to the individual plans as well for that. And something else, Judge Fuller, there's no allegation in the complaint that Express Scripts knew how Anthem was going to use the upfront payment that Express Scripts made to Anthem. For all Express Scripts knew, Anthem was going to use that money for the benefit of the plans that it contracted with, its customers. How in the world would they use it for the benefit of their customers? I think Mr. Kurtz is right, Judge Fuller, for the sake of getting more business, for the sake of expanding its business and saying we have now a buffer, we can do that, we can expand market share. But Express Scripts didn't have visibility into that and it wasn't positioned to make that decision for Anthem. And in terms of co-fiduciary liability, we respectfully submit for the reasons that courts have been agreeing, that pharmacy benefit managers in Express Scripts' position are not fiduciaries. It was not a fiduciary. There's no allegation that it knew of Anthem's fiduciary status. We respectfully would be surprised if Anthem were deemed a fiduciary, but there's no allegation that based on the law as it existed, that Express Scripts had a state of mind of knowing that Anthem was a fiduciary. And the law says there need to be that allegation in order for Express Scripts to be liable. And there are no plan assets that Express Scripts ever received or had control over. The only allegation of the complaint as to non-fiduciary liability that Express Scripts would have are based upon co-insurance payments. And everyone has agreed those are not plan assets, Your Honor. So there's no basis for Express Scripts to stay in this case unless Express Scripts is deemed a fiduciary by this court. And I would respectfully refer the court to Chamber amicus brief pages 17 to 24 that goes through in meticulous detail what courts have done in arriving in an accord that a pharmacy benefit manager in Express Script circumstances is not an ERISA fiduciary. And if you go with the plaintiff's theory in this case, it's not just every pharmacy benefit manager that becomes a fiduciary. It is drug manufacturers. It is health care providers. It is anyone who may do something that ultimately translates to the downstream price borne by consumers. And for that proposition, I would refer, Your Honor, to page 18 in the reply brief where there's an argument made that because Express Scripts in negotiating with drug manufacturers has some discretion at work, that makes it a fiduciary. Well, of course, manufacturers have that discretion too in their decisions. All right. That's a good place to stop. Thank you. We'll refer it to Mr. Lewis, who has at least three minutes for rebuttal. Thank you, Your Honor. At least three minutes each, at least. I just want to refer to the last point. This is Judge Winter. Can I probe your fiduciary obligation theory a little bit? Sure. It's based on the discretion in setting drug prices, as I understand it. And isn't it the case that any insurance contract that sets only a maximum price for certain drugs, isn't it the case that under your theory, the insurance company would be a fiduciary duty per se all the time? Well, I don't know that that's the case, Your Honor. I don't think there's evidence in the record that most are all PBM contracts that maximum prices. In fact, the law... I wasn't saying they did. Okay. I was just asking whether if you had a contract like Antrim's contracts with the plans that's been represented today, and it sets a maximum price, wouldn't under your theory the insurer be a fiduciary every time it negotiated with a purchaser? I don't know that the negotiation would make them a fiduciary. Yes, if the insurance company had discretion within a maximum to set drug prices, that would do. But there's no evidence in the record, by the way, as to the content of the contract between Antrim on the one hand and the plans on the other hand. There's representations that have been made to the court about that. But the allegation of the complaint is all those contracts did was say, Antrim will go out and through a PBM or otherwise provide drugs to the plans. But if there were those maximums set, Your Honor, Antrim would still be a discretionary fiduciary. If Antrim doesn't have discretion, then it couldn't give discretion to ESI. Well, that's correct, Your Honor, but Antrim did have discretion here on the allegations of the complaint, which, of course, were plausible and it must be accepted as true. We're on a motion to dismiss. Antrim had absolute discretion under the allegations of the complaint, the operative pleading, to go out and negotiate anything it wanted as far as drug prices were concerned with any pharmacy benefit manager that it wanted. I want to know what are the allegations of the complaint as to drug prices that it would insure? I'm sorry, Your Honor, what are the allegations? There aren't any. The allegations are not that Antrim would insure any specific drug prices. The allegations are that Antrim contracted with the plans to go out and obtain and manage pharmacy benefits and to obtain prices for pharmacy benefits through a contract with the PBM. That's all the complaint says. And that is obviously discretion. That's classic discretion. Well, didn't Antrim have provisions with the plans as to what prices were set, what it would pay off in insurance? No. It did not have fixed prices as to what it would pay. And on the record, there's nothing as to what was in them. It had discretion. It had discretion. And then, in turn, I want to correct a fundamental misstatement. So the ESI part of your allegations may be necessary to your claims against ESI, but as to the fiduciary obligation of the insurer, the ESI contract is a red herring. It's irrelevant because the insurer had the same discretion. Well, but they passed it on. And, Arisa, there's anybody whom it's passed on. But if discretion is the hallmark of a fiduciary, then the insurer was a fiduciary in seeking a contract in which it had discretion as to what prices. That's correct, Your Honor. No, not in seeking a contract, but once it signed contracts with the plans, which gave it that discretion, it became a fiduciary. And, in turn, Arisa does not limit the number of fiduciaries who may be responsible for a particular activity. So both Antrim was a fiduciary, and then it breached its duty. The only way Antrim could avoid being a fiduciary would be to negotiate a contract that had a fixed price for every drug. Not for every drug, but that negotiated fixed prices that said, we'll pass on exactly what the price we get from PBM. Or, as in a lot of the reported cases which defendants have cited, cite published lists. There are published prices. The typical contract, Your Honor, and this is what was available on the market, what Antrim did not negotiate, was you go out. Somebody in Antrim's position, which had tremendous bargaining power, I mean this was $100 billion a year, went to ESI. I'm trying to probe your theory. I know, I understand that, Your Honor. If I could just finish for one second. The typical contract said, or the PBM says, the PBM will charge average wholesale price, which is a published price, minus X percent discount. And that's what it does. And it says brand and generic drugs are characterized by, and this is true in a bunch of the reported cases that defendants cite, by reference to a Medicare list of what is brand and what is generic. If Antrim had done that in its contracts with the plans, then it would not be a fiduciary. And by the same token, if the contract between Antrim and Express Scripts had done that, it would not be a fiduciary, as Express Scripts would not be a fiduciary, as was the case in most of the cases that defendants rely on it. I don't know if that answers your question. I hope so, Your Honor. Yes, I think it does. Let me just clarify. You're saying that as long as the insurer's contract with a plan does not specify a precise formula for determining the price of a drug, so long as it doesn't do that, the insurer becomes a fiduciary as to prices. That's correct, Your Honor. That's the drug prices. That is correct. Thank you. And I want to correct a fundamental misstatement made by counsel, which is we don't rely just on Section 5.6. I mean, page after page of our briefing to this Court discusses Section 5.4, which Judge Ramos said constrains but does not eliminate discretion. Section 5.4 sets maximums, but within the maximums it gave express scripts discretion to set the prices, and it also gave express scripts the discretion to change the maximums. So, for example, or even the categorization of a drug as brand on the one hand, which costs a lot more, obviously, versus generic, which costs a lot less, in the standard contracts, which Xantham could have negotiated as a prudent fiduciary on the marketplace, it basically says we look at the categorization that Medicare publishes. In this case, however, express scripts in that contract was given the right to determine brand versus discretion on its own according to a proprietary formula. So they had a lot of discretion, and we don't hang our hats solely or even principally on Section 5.6. I also just want to refer to a couple of other points. The contract, the negotiation of the contracts, they were contingent on each other, and we don't contend that the negotiation on the marketplace of a contract to sell a subsidiary is an ERISA-covered function. That's not what makes Xantham a fiduciary. What made Xantham a fiduciary was in exercising their discretion to negotiate a contract with express scripts which had specific terms in it, they were a fiduciary. And the evidence of one of the breaches they committed was the breach of the fiduciary duty of loyalty, which is the highest duty, according to this Court, known to the law. They put their own self-interest ahead of that of the plans and their participants. They also, I have to point out, did not act prudently, which is, of course, one of the other main provisions of ERISA's fiduciary duty provisions because they had tremendous clout. And the question isn't whether they were charging more or less, I want to correct one thing, than what they had been charging through their own subsidiary. The issue for the prudent person standard is whether, if they had conducted themselves prudently, they could have negotiated with express scripts or some other pharmacy benefit manager, prices that were lower than those in the express scripts contract. Right. For the ultimate benefit of plans and their participants. That's correct. So it's not a comparison between what they were charging before this and what they were charging after. They have a duty to maximize their profits for their shareholders. Well, they may have that duty, but ERISA has a different duty. And as Judge Cardozo said a long time ago, and this Court has quoted him numerous times, when you're on that the characteristic of a fiduciary is something other than the morals, they're held to something other than the morals of the marketplace. So they may have been, maybe it's okay in a normal context to go out and try to maximize the amount of money that you get for a subsidiary sale, but you can't at the same time, simultaneously and contingent on that contract, breach your duty of loyalty to the plan participants. But if I understand their position, their position is that they were not, that the customers were not harmed, that they got a better or a price that was not affected by the, I'll say colloquially, the deal, the 2009 deal. Oh, that's not correct, because they were saying, what they said was that if you compare the prices under, at least initially under the Express Scripts contract, with what Anthem was charging through their own subsidiary, the plans and participants got a better deal. But that's not the standard, Your Honor. The standard is what a prudent and loyal fiduciary would have been able to negotiate with Express Scripts or some other PBM on the marketplace. So the complaint alleges in great detail, for example, that Express Scripts gave much cheaper pricing to other large customers without even nearly, who didn't have nearly the clout of Anthem. That's, it's very, there's a lot of detail in the complaint about what terms Express Scripts gave to those other people. And similarly, Express Scripts competitors may have offered better pricing. So the relevant question isn't what people were paying before, but what people were paying less. But what a prudent and loyal fiduciary would have negotiated had they not, had they gone out and not negotiated, at the same time they were negotiating more money for themselves. So it's the market, it's what's out in the market that a prudent fiduciary would have been able to negotiate, not what they were paying before versus what they were paying after, if that makes sense, if that answers your question, Your Honor. Thank you. Thank you. Thank you all for a lively and very well-managed argument. We'll reserve decision. The last two cases on our calendar are on submission, so I will ask the clerk to adjourn court. Court is adjourned.